Richard DOYLE, Plaintiff-Appellee,

v.

SOUTHERN GUARANTY CORPORATION, Defendant-Appellant.

Jimmy E. WOOD, Plaintiff-Appellee,

v.

FORT WAYNE MORTGAGE CO., Defendant-Appellant.

Nos. 85-8187, 85-8297.

United States Court of Appeals, Eleventh Circuit.

July 18, 1986.

Wyck A. Knox, Jr., Augusta, Ga., Douglas N. Campbell, Susan L. Kupferberg, Laura E. Stevenson, Atlanta, Ga., for defendant-appellant.

Thomas W. Tucker, John B. Long, David E. Hudson, Augusta, Ga., for plaintiff-appellee.

Before RONEY and CLARK, Circuit Judges, and FAIRCHILD *, Senior Circuit Judge.

RONEY, Circuit Judge:

Some federal statutes permit exemption from state usury laws if mobile home financing contracts afford protections to the consumer set forth in the federal laws. Not all the federal statutes require the same protection. These diversity jurisdiction usury cases present the question of whether FHA or VA-insured mobile home agreements, which provide the protections required by those separate Acts, are exempt from Georgia usury laws, even though the contracts do not contain the terms required by another federal exemption statute, section 501 of the Depository Institutions Deregulation and Monetary Control Act of 1980 (DIDMCA). DIDMCA was the statute dealt with in two recent *en banc* decisions. *Quiller v. Barclays American Credit, Inc.,* 764 F.2d 1400 (11th Cir.1985) (*en banc*), *cert. denied,* —— U.S. ——, 106 S.Ct. 1992, 90 L.Ed.2d 673 (1986); *Grant v. General Electric Credit Corp.,* 764 F.2d 1404 (11th Cir.1985) (*en banc*), *cert. denied,* —— U.S. ——, 106 S.Ct. 1993, 90 L.Ed.2d 673 (1986).

This is a consolidated appeal of two cases, one involving an FHA-insured agreement,[1] the other a VA-insured agreement.[2]

---

* Honorable Thomas E. Fairchild, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

1. Plaintiff in *Southern Guaranty Corp. v. Doyle* purchased a new mobile home from Family Homes Sales Center, Inc., d/b/a Eagle Homes Sales Center. Family Homes assigned the retail sales installment contract, dated January 25, 1983, to Southern Guaranty Corporation. The amount financed was $11,474.76, and the total finance charge over the contract's 15-year term was to be $17,507.04. The finance charge on

plaintiff's contract exceeded the amount permitted under O.C.G.A. § 10–1–33 by $294.90. This contract was insured by the Federal Housing Authority.

2. Plaintiff in *Fort Wayne Mortgage Co. v. Wood* purchased his mobile home on February 25, 1982 from Vintage Enterprises, Inc., d/b/a Colonial Mobile Homes, Inc. Vintage Enterprises assigned the retail installment sales contract to Fort Wayne Mortgage Company. The contract has a 15-year term. The amount financed was $22,400.00 and the finance charge $43,987.60.

We make three decisions at this time and certify a controlling question of state law to the Supreme Court of Georgia. *First,* we hold that a lender who complies with the requirements of the FHA or VA preemption statutes, for loans guaranteed under those statutes, need not also comply with DIDMCA in order to exempt itself from state usury limits on mobile home retail installment contracts. *Second,* we hold that the State of Georgia overrode the FHA and VA preemptions when it amended its usury limit on mobile home transactions in 1980 and 1981, even though the amendments referred to neither the FHA/VA statutes nor to FHA/VA-insured loans. *Third,* we hold that the Georgia statute of limitations does not bar these suits.

We *certify* to the Supreme Court of Georgia one question: whether Georgia's 1983 abolition of interest ceilings on mobile home retail installment contracts of the dollar amounts involved here eliminated the cause of action for usury of those purchasers who entered their contracts prior to the amendments' effective date.

Under Georgia law, a lender who violates the finance charge limitations contained in the Georgia Motor Vehicle Sales Finance Act (GMVSFA) is barred from recovering *any* of the finance charge. O.C.G.A. § 10–1–38(b). A lender who willfully violates the statute is subject to an additional penalty of double the time-price differen-

tial. O.C.G.A. § 10–1–38(c). The finance charge on both contracts involved here exceeded the maximum rate of interest (10% add-on) then allowed under GMVSFA. O.C.G.A. § 10–1–30 *et seq.*

The cases came to us on a 28 U.S.C.A. § 1292(b) appeal of the legal questions decided by the district court in denying defendants' motions for dismissal for failure to state a cause of action and summary judgment.

The district court held that an FHA or VA-insured mobile home lender may not rely on the FHA or VA preemption statutes alone, but rather must also comply with the DIDMCA regulations in order to receive federal exemption from the state usury laws. On this point, we reverse the district court. The district court held that Georgia's 1983 amendments eliminating interest rate limits on mobile home retail sales installment contracts of $3000.00 or more apply prospectively only and did not affect the causes of action herein asserted. This point we certify to the Supreme Court of Georgia. The district court also ruled on class action and discovery issues which are inappropriate for us to decide.

### A. *FHA/VA Versus DIDMCA*

■ The FHA and the VA preemption statutes were enacted at approximately the same time.[3] The VA statute received final

---

This finance charge exceeded the amount permitted under O.C.G.A. § 10–1–33 by $10,387.60. This contract was insured by the Veterans Administration.

3. The FHA preemption statute was enacted as section 308 of the Housing and Community Development Amendments of 1979, Pub.L. No. 96–153, 93 Stat. 1101, 1113–14, approved on December 21, 1979. The statute is codified at 12 U.S. C.A. § 1735f–7, as follows:

(a) The provisions of the constitution of any State expressly limiting the rate or amount of interest, discount points, or other charges which may be charged, taken, received, or reserved by lenders and the provisions of any State law expressly limiting the rate or amount of interest, discount points, or other charges which may be charged, taken, received, or reserved shall not apply to any loan, mortgage, or advance which is insured under subchapter I or II of [the National Housing Act].

(b) The provisions of subsection (a) shall apply to loans, mortgages, or advances made or executed in any State until the effective date (after December 21, 1979) of a provision of law of that State limiting the rate or amount of interest, discount points, or other charges on any such loan, mortgage, or advance. Although this section does not refer expressly to mobile home loans, the National Housing Act includes certain mobile home loans within the class of insurable loans. 12 U.S.C.A. § 1703.

The VA preemption statute was enacted as section 401 of the Veterans' Disability Compensation and Survivors' Benefits Amendments of 1979, Pub.L. No. 96–128, 93 Stat. 982, 986–87, approved November 28, 1979. It is codified at 38 U.S.C.A. § 1828 (as amended in 1981), as follows:

If, under any law of the United States, loans and mortgages insured under title I or title II of the National Housing Act are exempt from the application of the provisions of any State

approval several days before the FHA statute. It makes the VA exemption the same as that provided for FHA loans. Therefore, the intent and consequences of both statutes should be the same on the issue before us.

Although the published legislative history regarding the FHA preemption statute gives little guidance as to Congress' purpose in enacting the federal preemption, the VA legislative history provides some insight as to the purpose of the joint FHA/VA preemption.

The Senate Report accompanying the VA legislation noted that although the purpose of state usury laws is to protect state residents against exorbitant interest rates, the laws may effectively "bar lenders from making VA loans and thus prevent veterans from using their loan-guaranty entitlement." S.Rep. No. 260, 96th Cong., 1st Sess. 30, *reprinted in* 1979 U.S.Code Cong. & Ad.News 1894, 1916. Usury limits in several states were impeding FHA and VA loans, and in Arkansas, the state limit was so low as to have "brought VA loan activity to a virtual halt." *Id.* The purpose of the preemption provision was to assure, to the maximum extent possible in any jurisdiction in which FHA loans were exempt, that a veteran seeking to use his or her loan-guarantee entitlement for a conventional home, mobile home, or any other

authorized purpose would not be discouraged or prevented by reason of a state anti-usury provision. Explanation of House Bill, Senate Amendment, and Compromise Agreement, 125 Cong.Rec. 16,753, *reprinted in* 1979 U.S.Code Cong. & Ad. News 1966, 1969. Under both the FHA and VA provisions, however, "the State's right to set an interest-rate limitation that overrides the Federal exemption would be preserved." S.Rep. No. 260, *supra*, at 31, 1979 U.S.Code Cong. & Admin.News at 1917.[4]

Within four months after the FHA and VA exemptions became law, Congress enacted a third federal preemption provision, DIDMCA, referred to here as section 501.[5] This statute preempts state usury laws with regard to a broad range of residential loans and lenders. A Senate committee reported that the bill was a response to the finding that in states where usury laws require mortgage rates below market levels of interest, mortgage funds will not be readily available and those funds will flow to other states where market yields are available. This artificial disruption of funds availability is harmful to potential homebuyers in states with such usury laws and frustrates national housing policies and programs. S.Rep. No. 368, 96th Cong., 2d Sess. 19, *reprinted in* 1980 U.S.Code Cong. & Ad.News 236, 254.[6]

constitution or law (1) limiting the rate or amount of interest, discount points, or other charges which may be charged, taken, received, or reserved by lenders, (2) restricting the manner of calculating such interest (including prohibition of the charging of interest on interest), or (3) requiring a minimum amortization of principal, then loans guaranteed or insured under this chapter are also exempt from the application of such provisions.

"Under this provision, wherever loans insured by the Federal Housing Administration (FHA) are exempted from a State anti-usury provision by a provision of the National Housing Act, ... VA loans would also be exempted. In this way, the coordination of Federal policy regarding the exemption of VA and FHA home loans from State anti-usury provisions would be assured." S.Rep. No. 260, 96th Cong., 1st Sess. 29, *reprinted in* 1979 U.S.Code Cong. & Ad.News 1894, 1915.

4. Under the scheme in the VA statute, "any State that overrode the exemption for FHA loans would also be overriding the exemption for VA loans." S.Rep. No. 260, *supra* note 3, at 31, 1979 U.S.Code Cong. & Admin.News at 1917. The purpose of providing for an exemption in this manner was "to assure a coordinated Federal policy with regard to the application of State anti-usury provisions to FHA and VA home loans." *Id.*

5. Depository Institutions Deregulation and Monetary Control Act of 1980 (DIDMCA), Pub.L. No. 96–221, § 501, 94 Stat. 132, 161–63 (codified as amended at 12 U.S.C.A. § 1735f–7 note).

6. The committee further opined that "this limited modification in state usury laws will enhance the stability and viability of our Nation's financial system and is needed to facilitate a national housing policy and the functioning of a national secondary market in mortgage lending." S.Rep.

Because of "the congressional policy of permitting a state the primary opportunity to determine its usury statutes," *id.* at 18, 1980 U.S.Code Cong. & Admin.News at 254, however, section 501 provided that an individual state could within three years enact a law specifying that the state intended to override section 501.

In order for mobile home financing to come under the DIDMCA preemption, the financing contract must contain certain consumer protection provisions specified in Federal Home Loan Bank Board regulations.[7]

This Court concludes that although the DIDMCA statute encompasses the "federally related" mobile home loans involved in this case and therefore overlaps with the FHA and VA preemptions, this dual coverage does not nullify the FHA and VA preemptions as applied to mobile home loans. FHA or VA lenders may obtain federal preemption under the respective FHA or VA preemption without also satisfying the DIDMCA requirements. If, however, the state has overridden the FHA/VA preemption, the lender may still qualify for federal preemption by complying with the DIDMCA regulations (unless, of course, the state has also overridden the DIDMCA preemption). These conclusions come from the following analysis.

All of the statutes in question were enacted by the 96th Congress in a six-month time span. The same House and Senate committees considered both the FHA and DIDMCA statutes.

The FHA and VA statutes aimed at addressing the specific problem of state usury laws restricting FHA and VA home loan availability to qualified purchasers. In contrast, the purpose of DIDMCA was more wide-ranging. DIDMCA applied not only to federally insured loans but to all home loans, including conventional loans, which were in some way "federally related," a phrase defined broadly in section 501. "The law seeks to facilitate the free flow of capital into states with restrictive interest rates." *Recent Developments,* 36 Bus.Law. 1237, 1243 (1981). Congress believed the DIDMCA preemption was needed to enhance the stability of the national financial system and to facilitate a national housing policy.[8]

It is unreasonable to believe that Congress, in addressing the more immediate concern of FHA and VA loan availability to individual borrowers, would require the lender to comply with the additional DIDMCA regulations in order to obtain federal preemption. The district court and plaintiffs have placed great reliance on the supposedly "better" consumer protection the DIDMCA regulations provide. Nothing, though, indicates that the FHA and VA protections are inadequate.[9] Although the

---

No. 368, *supra,* at 19, 1980 U.S.Code Cong. & Admin.News at 254.

7. These include late charges only when a payment is 15 days late, and 30 days notice before acceleration or foreclosure. Both the Doyle and Wood contracts permit assessment of a late charge for any payment which is 10 days late and do not contain a requirement of notice before acceleration or foreclosure. Under this Court's recent decision in *Quiller v. Barclays American/Credit, Inc.,* 764 F.2d 1400 (11th Cir. 1985) *(en banc), adopting* 727 F.2d 1067 (11th Cir.1984), *cert. denied,* —— U.S. ——, 106 S.Ct. 1992, 90 L.Ed.2d 673 (1986), the Doyle and Wood contracts are not entitled to the DIDMCA preemption.

8. "A stable home financing system was the principal reason for the establishment by the federal government of the FHA and VA programs, the federal chartering of savings and loan associa-

tions and the national secondary market mechanisms." S.Rep. No. 368, *supra,* at 19, 1980 U.S. Code Cong. & Admin.News at 254.

9. In the House Conference Report accompanying the FHA legislation, the conferees noted their awareness that

... installment credit sale contracts have been criticized for frequently containing provisions which do not adequately protect consumers. However, the conferees note that with respect to such contracts used to finance mobile homes under Title I of the National Housing Act, FHA regulations already provide significant protections by prohibiting both the Rule of 78 and balloon payments, and by limiting late charges. FHA also provides an interest rate ceiling.

H.R.Conf.Rep. No. 706, 96th Cong., 1st Sess. 61, *reprinted in* 1979 U.S.Code Cong. & Ad.News 2402, 2420.

regulations appearing under DIDMCA are not identical to the FHA and VA regulations,[10] they address similar concerns and overlap substantially. Indeed, the House Conference Report accompanying DIDMCA stated: "The conferees intend that in developing [the DIDMCA] regulations the Bank Board should look for guidance to regulations, handbooks and circulars of the FHA and VA regarding mobile home lending...." H.R.Conf.Rep. No. 842, 96th Cong., 2d Sess. 79, *reprinted in* 1980 U.S. Code Cong. & Ad.News 298, 309.

Several other points support independent interpretation of the FHA, VA, and DIDMCA preemptions. First, section 529 of DIDMCA repealed certain existing laws but made no mention of the FHA or VA preemption statutes. Second, section 528 of DIDMCA [11] demonstrates that Congress intended to retain independent vitality in the respective statutory schemes. Finally, a HUD opinion letter supports this interpretation.[12]

At the time the FHA and VA preemptions were enacted, DIDMCA was well through the congressional committee process. It simply defies reason that Congress would enact one preemption if it were considering a second preemption which would render the first meaningless. This Court holds that a lender entitled to

preemption under the FHA or VA statutes need not comply with the DIDMCA regulations.

### B. *State Override*

■ The next question presented to this Court is whether the State of Georgia has overridden the FHA and VA preemptions. The district court did not reach this issue due to its resolution of the first issue. Because under the VA provision "any State that overrode the exemption for FHA loans would also be overriding the exemption for VA loans," S.Rep. No. 260, *supra*, at 31, 1979 U.S.Code Cong. & Admin.News at 1917, this Court need only examine whether Georgia has overridden the FHA provision.

Soon after the effective date of the FHA and VA preemption statutes, the Georgia General Assembly amended O.C.G.A. § 10-1-33 to raise the interest limit on Class 1 "motor vehicle" retail installment contracts to 10% add-on. "Motor vehicle" loans are defined to include mobile home loans, but section 10-1-33 does not apply to other types of home loans or mortgages. The 1980 amendments to section 10-1-33 refer to neither "federally insured" loans nor the FHA/VA preemption statutes. 1980 Ga. Laws 523.[13]

The finance companies argue that the phrase "*such* loan, mortgage, or advance"

---

10. The regulations governing FHA-insured manufactured home loans, appearing at 24 C.F.R. §§ 201.501–.680, require prepayment rebates, prohibit the use of balloon payments, and govern late charges and refinancing. Additionally, although that limitation has now been repealed, the FHA regulations limited the maximum permissible finance charge at the time Doyle obtained his loan. Similar regulations, appearing at 38 C.F.R. § 36.4201 *et seq.*, govern VA-insured manufactured home loans.

11. "In any case in which one or more provisions of, or amendments made by, this title, section 529 of the National Housing Act, or any other provision of law ... apply with respect to the same loan, mortgage, credit sale, or advance, such loan, mortgage, credit sale, or advance may be made at the highest applicable rate." 12 U.S.C.A. § 1735f–7 note.

12. An April 1, 1985, opinion letter from Shirley Wiseman, General Deputy Assistant Secretary for Housing, clarifying HUD letter TI–352 (Supplement), states: "It was then, and is now, this

Department's interpretation of the two preemption laws that they are separate and independent of each other, and that if a manufactured home lender can charge a preemptive interest rate pursuant to § 529 of the National Housing Act it need not rely upon § 501 of the Deregulation Act, and thus need not comply with 12 C.F.R. 590.4."

13. The Act itself states that it amends GMVSFA "so as to change the limitations on finance charges; to provide for the computation of finance charges on an actuarial basis in addition to the add-on basis; to delete the acquisition charge; to provide for other matters relative thereto; to provide for an effective date; to provide for automatic repeal; to provide for reinstatement of certain finance charges; to repeal conflicting laws; and for other purposes." 1980 Ga.Laws at 523–24. A 1981 amendment struck the repealer provision. 1981 Ga.Laws 703.

in the FHA statute, 12 U.S.C.A. § 1735–7(b), quoted *supra* note 3, refers back to subsection (a) of the statute, and that the state law must refer specifically to loans insured under titles I and II of the National Housing Act in order to override the preemption. Plaintiffs, on the other hand, suggest that "such loans" refers to the type of loan being made, such as real estate loans or mobile home loans, and that a state need only pass a statute regulating the general type of credit transaction. Because Georgia subsequently amended GMVSFA to raise and "reinstate" the usury limits on mobile home contracts, plaintiffs argue, Georgia has overridden the FHA and VA preemptions for mobile home transactions.

The language of the FHA statute is less than clear and would support either of these interpretations. The legislative history, moreover, provides no firm guidance.[14] The Court concludes, however, that the statute must be read to require only that the state reenact its anti-usury provision and not to require specific reference to FHA-insured loans.

Unlike the FHA preemption, the DIDMCA preemption is clear in mandating specific language in the state override provision.[15] Congress was already considering this language at the time that the FHA preemption was enacted. Congress knew the type of language to use when it intended that state override provisions make specific reference to the federal preemption. The Department of Housing and Urban Development apparently also interprets the respective statutes in this manner.[16]

**14.** The Senate Committee Report on the FHA legislation notes that the preemption "would not apply where a state subsequently reenacts a usury limit *applying to FHA loans.*" S.Rep. No. 164, 96th Cong., 1st Sess. 33 (1979). Similarly, the House Report notes that "subsequent to the date of enactment of this Act, the states may act to *subject these FHA instruments* to state usury ceilings." H.R.Rep. No. 154, 96th Cong., 1st Sess. 24, *reprinted in* 1979 U.S.Code Cong. & Ad.News 2317, 2340. On the one hand, this language could be read to require specific reference to FHA instruments in the state law. On the other, it could be read as simply requiring that the state law "apply" to FHA insured loans without necessarily singling them out in the statute.

In another part of the House Report, the House committee states:

Section 310 of the bill would add a new section 529 to the National Housing Act which would provide that the provision of any State constitution or law expressly limiting the rate or amount of interest, discount points or other charges which may be charged or received by lenders shall not apply to any loan, mortgage or advance which is insured under titles I or II of the National Housing Act. The section would also provide that this exemption would not apply to such loans, mortgages or advances if a State were to enact *such a limitation* after the effective date of this section.

*Id.* at 63, 1979 U.S.Code Cong. & Admin.News at 2379. The phrase "such a limitation" here seems to refer to the state's general usury law; that is, the state need only reenact its usury law to override the preemption. The Senate Report accompanying the VA legislation also supports this interpretation. Discussing the effect of the FHA legislation, the Senate Report states that

loans insured under title I or II of the National Housing Act "would not be exempt in any State that reinstated its anti-usury provision after the effective date of the new Federal law." S.Rep. No. 260, *supra* note 3, at 31, 1979 U.S.Code Cong. & Admin.News at 1917.

**15.** [T]he provisions of subsection (a)(1) shall not apply to any loan, mortgage, credit sale, or advance made in any State after the date (on or after April 1, 1980, and before April 1, 1983) on which such State adopts a law or certifies that the voters of such State have voted in favor of any provision, constitutional or otherwise, *which states explicitly and by its terms* that such State does not want the provisions of subsection (a)(1) to apply with respect to loans, mortgages, credit sales, and advances made in such State.

Section 501(b)(2) (codified at 12 U.S.C.A. § 1735f–7 note).

**16.** The April 1985 letter from the General Deputy Assistant Secretary for Housing, *supra* note 12, states that under the FHA preemption "an override occurs if a State enacts a provision of law after the effective date of § 529 which limits the rate or amount of interest, discount points, or other charges on a manufactured home loan.... On the other hand, the ability of a State to override the § 501 [DIDMCA] preemption is more circumscribed, because ... the State must either adopt a law or certify that the voters of the State have voted in favor of a provision which states explicitly and by its terms that it does not want the provisions of § 501(a)(1) to apply in that State." Additionally, the letter sets forth four scenarios of possible legislative action. In three of those scenarios, the state "enacts a law which limits the rate or

The lenders have argued that it is illogical to conclude that a state could override the FHA and VA preemptions by merely adjusting the permissible interest rate on some loans which may be insured, as there would be many unintentional overrides, and the result would create instability in the FHA and VA programs and frustrate the policies behind the federal legislation. This argument overstates the case. The FHA and VA preemptions were enacted in large part because individual states had been unable or unwilling to amend their usury limits to reflect increases in market interest rates. Congress was concerned with assisting states such as California and Arkansas, which had troublesome procedures for removing or raising state constitutional or statutory limits. *See, e.g.,* S.Rep. No. 260, *supra,* at 30. At the same time, Congress recognized its traditional deference to the state's right to determine its usury statute. When the state goes through the entire legislative or constitutional process of reenacting or amending its usury limitation, it is unlikely that it will do so in ignorance of the federal preemptions or of market forces. For a state to raise its usury limit in response to changes in market interest rates is consistent with the purpose of the FHA and VA preemptions. The Court determines, given Congress' deference to states' rights to fix their own usury law, as well as the purpose behind the federal law, that when a state reenacts or raises its usury limit on a particular class of loans, it overrides the FHA and VA preemptions for that type of loan in the absence of a contrary statement.

### C. *Statute of Limitations*

■ Although defendants presented a statute of limitations defense in their answers, the issue was neither argued nor addressed in the district court. Defendants argue that these actions are barred because both actions were instituted more than one year after the respective contracts were formed. Although GMVSFA and its penalty provision state no limitations period themselves, defendants suggest that the general one-year statute applying to usury actions contained in O.C.G.A. § 7–4–10(d) applies here as well.[17]

The issue is amenable to prompt resolution in this appeal. The Court agrees that O.C.G.A. § 7–4–10(d) seems to apply in these actions, but disagrees with defendants regarding the effect of this statutory bar. Rather than concluding that this statute acts as a complete bar to actions filed more than a year after contract formation, the courts interpreting the statute have held that it bars only actions to affirmatively recover interest paid more than a year before the action was instituted. *Duderwicz v. Sweetwater Savings Association,* 595 F.2d 1008, 1115 n. 11 (5th Cir.1979); *Reconstruction Finance Corp. v. Puckett,* 181 Ga. 288, 181 S.E. 861 (1935); *Family Home Services, Inc. v. Taylor,* 142 Ga.App. 386, 236 S.E.2d 28 (1977); *Hartsfield Co. v. Watkins,* 67 Ga.App. 411, 20 S.E.2d 440 (1942).

### D. *Retroactivity*

The district court decided that a Georgia statute enacted in 1983 which removes the interest rate ceiling on mobile home installment sales contracts in excess of $3000.00 [18] did not apply to these lawsuits

---

amount of interest, discount points, or other charges *on a manufactured home loan."* In all three scenarios, the letter concludes that the state has overridden the FHA preemption.

**17.** "No plea or action for the recovery of such forfeiture shall be barred by lapse of time shorter than one year." O.C.G.A. § 7–4–10(d).

**18.** In 1983, the Georgia General Assembly enacted wide-ranging amendments pertaining to interest and usury, some of which relate to mobile home financing. 1983 Ga.Laws 1146. In section 7 (codified at O.C.G.A. § 7–4–20), the legis-

lature exercised its prerogative to override section 501 of DIDMCA for loans, mortgages, credit sales, and advances made in Georgia on or after March 31, 1983. Concurrently, the legislature removed interest rate limits on mobile home retail installment contracts of $3000.00 or more. "Notwithstanding the provisions of subsections (a) through (c) of Code Section 10–1–33, any retail installment contract pertaining to ... [a]ny manufactured home with a cash sales price of more than $3,000.00 ... may provide for such finance charge as the parties may agree in writing." Section 2 (codified at O.C.G.A. § 7–4–3(a)). The legislature required, though,

filed after the statute's effective date as to contracts executed before that date. If the statute is applied retroactively to loans predating the statute, then plaintiffs would have no cause of action.

The Georgia courts now hold unequivocally, in the absence of a savings clause, that repeal of a usury limit operates retroactively to lift the penalty for usury. *See, e.g., Ward v. Hudco Loan Co.,* 254 Ga. 294, 328 S.E.2d 729 (1985); *Fountain v. Dixie Finance Corp.,* 252 Ga. 543, 314 S.E.2d 906 (1984); *Dorsey v. West,* 252 Ga. 92, 311 S.E.2d 816 (1984); *Southern Discount Co. v. Ector,* 246 Ga. 30, 268 S.E.2d 621 (1980); *Wasser v. Citizens & Southern National Bank,* 170 Ga.App. 872, 318 S.E.2d 518 (1984). At least one section of the 1983 Act has been held retroactive. In *Ward v. Hudco Loan Co.,* the court held retroactive the amendment to O.C.G.A. § 7–4–2(a)(1).[19]

The district court held, however, that these normal rules of construction cannot apply in this case. In all of the prior cases, the legislature simply abolished the interest limits applying to a particular class of loans. Here, the legislature coupled this removal with a requirement that retail installment contracts comply with certain federal regulations. Although the removal is not "conditioned" *per se* on compliance with the regulations, the legislature obviously intended for there to be a trade-off: in exchange for losing usury law protection, prospective borrowers would receive other consumer protections.

The district court concluded that logically the legislature would have considered these protections no less important for contracts preceding March 30, 1983. Many of these contracts, though, would not contain the federal protections. Moreover, if the legislature attempted to apply the new penalty provisions to pre-1983 Act contracts, the district court thought serious constitutional questions would arise. Rather than applying only part of the new statute to the pre-Act contracts, the district court determined that it is more likely that the Georgia General Assembly intended the "package" to apply only as a whole to loans post-dating the Act's effective date.

Because this question of state law appears to control the outcome of this action and there are no clear controlling precedents in the decisions of the Supreme Court of Georgia, we certify the question to the Supreme Court of Georgia pursuant to Rule 37 of the Rules of the Supreme Court of Georgia.

CERTIFICATE FROM THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT TO THE SUPREME COURT OF GEORGIA PURSUANT TO RULE 37 OF THE SUPREME COURT OF GEORGIA, TO THE SUPREME COURT OF GEORGIA AND THE HONORABLE JUSTICES THEREOF.

*Question to be Certified*

Whether section 2 of 1983 Ga.Laws 1146, O.C.G.A. § 7–4–3(a), which provides that O.C.G.A. § 10–1–33 shall not apply to retail installment contracts pertaining to any manufactured home with a cash sales price of more than $3,000.00, operates retroactively so as to eliminate any cause of action a manufactured home purchaser may have acquired under O.C.G.A. § 10–1–38 by a

---

that any such contract comply with the DIDMCA regulations. Any person failing to comply with these regulations would be subject to the liability specified in O.C.G.A. § 7–4–5. Section 7–4–5 specifies that the person will be liable for (1) any actual damage sustained by the other person as a result of the failure, as well as (2) twice the amount of any interest or finance charge contracted for in connection with the transaction, "except that the liability under this paragraph shall not be less than $100.00 nor greater than $1,000.00." This liability may only be asserted in an individual action, "provided, however, this provision shall not apply to any class action pending prior to March 31, 1983." Although the amendments provided that O.C.G.A. § 10–1–33 would not apply to mobile home retail installment contracts of $3000.00 or more, section 10–1–33 itself was left unamended.

19. "Notwithstanding the provisions of other laws to the contrary, except Code Section 7–4–18, the parties may establish any rate of interest ... agreed upon in writing by the parties where the principal amount involved is more than $3,000.00...." O.C.G.A. § 7–4–2(a)(1).

transaction prior to the 1983 Act's effective date.

The phrasing used in the certified question is not to restrict the Supreme Court's consideration of the issue in its analysis of the record certified in this case. This extends to the Supreme Court's restatement of the issue and the manner in which the answer is given. *See Martinez v. Rodriquez*, 394 F.2d 156, 159 n. 6 (5th Cir.1968).[20]

The clerk of the court is directed to transmit this certificate, as well as the briefs and record filed with the court, to the Supreme Court of Georgia and simultaneously to transmit copies of the certificate to the attorneys for the parties.

QUESTION CERTIFIED.

**20.** The Georgia General Assembly amended O.C.G.A. § 10–1–33 in 1985 to add a new subsection (d), effective April 2, 1985: "Notwithstanding the provisions of subsection (a) of this Code section, a buyer and a seller may establish any finance charge agreed upon in writing by the parties where the amount financed is more than $5,000.00." § 2, 1985 Ga.Laws 698, 699. None of the parties pointed out this amendment in either their briefs or at oral argument, but the appellee has cited it in a post-argument submission. In considering the issue certified in this case, the Supreme Court of Georgia is, of course, free to consider any effect this 1985 amendment might have on the present cases.